UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20398-CR-UNGARO/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MABEL DIAZ and ABNER DIAZ

    Defendants.
_____/

## ORDER

THIS MATTER is before the Court pursuant to Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert[1] Hearing (DE# 247, 2/21/08). Having reviewed the applicable filings and the law and having held an evidentiary hearing on March 19, 2008, it is

ORDERED AND ADJUDGED that Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert Hearing (DE# 247, 2/21/08) is **GRANTED in part and DENIED in part**.

## BACKGROUND

Mabel and Abner Diaz (hereinafter "defendants") are charged in a 56-count[2] Second Superseding Indictment with Conspiracy to Commit Health Care Fraud (Count 1) in violation of 18 U.S.C. § 1349, Health Care Fraud (Counts 2-33) in violation of 18 U.S.C. § 1347, Conspiracy to Commit Money Laundering (Counts 34 and 39) in

---

[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

[2] The defendants are named in every count of the Superseding Indictment except counts 37 and 44.

violation of 18 U.S.C. § 1956(h), Money Laundering (Counts 35-36, 38) in violation of 18 U.S.C. § 1957, Money Laundering (Counts 40-24) in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and Aggravated Identity Theft (Counts 45-56) in violation of 18 U.S.C. § 1028A.

On February 21, 2008, the defendants filed Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert Hearing (DE# 247, 2/21/08). The government filed Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261) on March 4, 2008. The defendants' reply was filed on March 10, 2008. See Mabel and Abner Diaz's Reply to Government's Response to Motion to Exclude Expert Testimony (DE# 266, 3/10/08).

On March 19, 2008, the Court held an evidentiary hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). At the Daubert hearing, the government presented the testimony of one of its experts Edith "Peggy" Sposato, an Advanced Registered Nurse Practitioner. No other witnesses testified at the hearing. The Court admitted Government Exhibits H0, H1, H5, H7 and H8. At the Court's request, the government filed a supplement to its response on March 26, 2008. See Government's Supplement to Response to Motion to Exclude Expert Testimony (DE# 283, 3/26/08).

## LEGAL STANDARD

"Federal Rule of Evidence 702, as explained by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc.[, 509 U.S. 579 (1993)] and its progeny, controls determinations regarding the admissibility of expert testimony." City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (footnote and citation

omitted). Under Rule 702:

> [e]xpert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. (footnote omitted). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

In Daubert, the Supreme Court applied the following factors in determining whether scientific expert testimony was admissible under Rule 702: (1) whether the theory or technique can and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) what the theory or technique's known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether the expert's theory or technique is generally accepted in the field. Daubert, 509 U.S. at 593-94.

The Daubert inquiry is a flexible one, giving district courts great latitude in determining which of the Daubert factors, if any, are appropriate in assessing the admissibility of expert testimony in a particular case. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (noting that "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). "Whether the Daubert opinion factors are even pertinent to assessing reliability in a given case will 'depend[ ] on the nature of the issue, the expert's particular expertise, and the

3

subject of his or her testimony.'" United States v. Brown, 415 F.3d 1257, 1267 (11th Cir. 2005) (citing Kuhmo, 526 U.S. at 150). In Brown, the Eleventh Circuit affirmed the district court's order admitting the testimony of two experts even though the experts' methodology only satisfied one Daubert factor. Id.

## DISCUSSION

In their motion in limine, the defendants seek to exclude the testimony of three of the government's expert witnesses: Edith M. Sposato (an Advanced Registered Nurse Practitioner who is employed by the United States Attorney's Office), Dr. Klaus J. Miescke (a professor in the Department of Mathematics, Statistics, and Computer Science at the University of Illinois) and Stephen Sulpor (a statistician who works for Centers for Medicare and Medicaid Services). See Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert Hearing (DE# 247 at 2, 2/21/08).

### I.     Edith "Peggy" Sposato

In the instant case, the government charges the defendants with using their medical billing company to submit fraudulent claims to Medicare. In August 2004, the government seized more than 400 boxes of records from the defendants' billing company. See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 2, 3/4/08). The government's statisticians, Dr. Klaus J. Miescke and Stephen Sulpor, selected "a statistically significant random sample of claims packets" (hereinafter "packets")[3] for the fourteen suppliers of durable

---

[3] These packets contain prescriptions for durable medical equipment, beneficiary records (such as a Medicare card or driver's license but not medical records) and, in some cases, additional supporting documentation such as a certificate of medical

4

medical equipment that were named in the original indictment whose claims were submitted in 2003 and 2004.[4] Id. at 2. The government provided these sample packets to Ms. Sposato for analysis. Ms. Sposato analyzed the packets and identified certain characteristics or categories which she believed were evidence of fraud. The categories identified by Ms. Sposato were:[5]

    1.    The diagnosis written on the medical order doesn't support the treatment prescribed.

    5.    The treatment prescribed on the order is inconsistent with the HCPCS[6] codes written.

    7.    The order prescribes a medically excessive amount of durable medical equipment.

    8.    The order implies a suspiciously extreme injury, either through what is prescribed, or what HCPCS codes are written.

See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 3, 3/4/08). Some of these packets fell into more than one category.

    Ms. Sposato will not testify that the packets containing one or more of these categories are fraudulent. "Rather, she will testify . . . that most of the claims packets

---

necessity.

[4] The government chose these specific parameters because it did not have cooperating co-defendants or consensual recordings for this period. See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 2, 3/4/08).

[5] Initially, Ms. Sposato identified eight categories. At the evidentiary hearing, the government withdrew categories 2, 3, 4 and 6. To avoid confusion, the Court will continue to use the same numbers assigned to the original eight categories in this Order.

[6] HCPCS is an acronym for "Healthcare Common Procedure Coding System." HCPCS is a medical coding system used by Medicare.

she examined had at least one, and in most cases several, of the[se] characteristics . . . ." See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 7, 3/4/08). At trial, the government will present testimony that Mabel Diaz told employees to write osteoarthritis as the diagnosis on fraudulent prescriptions and that the defendants told the employees which medical billing codes to use without advising them of the injuries the patient had at the time. The government intends to argue that the categories or characteristics identified by Ms. Sposato, as corroborated by the testimony of company employees, are evidence of fraud. Id.

    **1.    Qualification**

The first requirement for the admissibility of expert testimony is that the expert is qualified to testify competently regarding the matters he or she intends to address. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d at 563. Rule 702 permits a person to qualify as an expert based upon knowledge, skill, experience, training, or education. Frazier, 387 F.3d at 1260-61. The defendants argue that Ms. Sposato's nursing experience does not qualify her to second guess a doctor's prescribed treatment, particularly when she is not privy to any medical records and did not examine the patient. For instance, the defendants argue that the conclusion that medical equipment is "excessive" (category 7) is generally determined by a doctor not a nurse. See Mabel and Abner Diaz's Reply to Government's Response to Motion to Exclude Expert Testimony (DE# 266 at 4, 3/10/08).

Ms. Sposato testified that category 7 was comprised of excessive orders of drainable ostomy pouches. Ms. Sposato explained that a patient only needs two

drainable ostomy pouches because they are reusable.[7] The records show that thirty pouches were ordered for a single patient per month. Ms. Sposato is qualified to testify that a prescription for 30[8] reusable ostomy pouches per month is excessive based on her extensive nursing experience and treatment of ostomy patients. Ms. Sposato's experience and training also qualifies her to testify concerning the other three categories.

Ms. Sposato earned her nursing diploma from the Willard School of Nursing in the early 1960s. After passing her boards, she became a registered nurse. In 1974, Ms. Sposato earned a Bachelor of Science degree in nursing from Florida International University and a Nurse Practitioner Certification from the University of Miami. A nurse practitioner, working under the supervision of a doctor, is permitted to take a patient's health history, conduct a physical exam, interpret lab reports and x-rays, prescribe treatment and refer patients to specialists. Ms. Sposato also holds a Master's degree in health management from St. Thomas University and a Legal Nurse Consultant Certification from the Florida School of Risk Management.

Ms. Sposato worked as nurse in an emergency room in New Jersey and at Mt. Sinai Medical Hospital in Miami Beach. See Sposato Resume, Exhibit 9 to Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261, 3/4/08). From 1974 until 1990, Ms. Sposato managed a clinic and

---

[7] Ms. Sposato acknowledged that disposable ostomy pouches can also be used. However, the pouches reflected in the packets were reusable pouches.

[8] At the evidentiary hearing, there was some confusion on whether Medicare was actually billed for 30 ostomy bags per patient or whether the number "30" referred to the number of times the ostomy bag should be changed. This issue is addressed below.

treated patients at a retirement community. During this time, Ms. Sposato provided direct care to seniors which included assessing patients and creating and maintaining a medical history that incorporated physicians, medications and special needs. Id. From 1990 to 1995, Ms. Sposato was the director for Humana Seniors Association. Her duties included researching and interpreting Medicare billing and assisting in claims filing. In 1995 and 1996, Ms. Sposato spent a year and four months working on an internal audit of medical records and billings to ensure compliance with Medicare regulations. Ms. Sposato has worked at the United States Attorney's Office for the Southern District of Florida as a nurse investigator since 1996. Her duties include reviewing medical records and determining coding and medical necessity.

In United States v. Majors, 196 F.3d 1206 (11th Cir. 1999), the defendants appealed the district court's admission of the government's financial expert under Rule 702 because the witness was not a certified public accountant and had no experience in small business management or in the preparation of consolidated financial statements. The Eleventh Circuit affirmed the district court noting that the witness had "previously performed financial analyses for the FBI in over fifty cases for more than eight and one-half years . . . . [and] had testified in . . . cases involving bank fraud, mail fraud and money laundering investigations." Id. at 1215. The Court concluded that "[b]y virtue of training and experience, he possessed special knowledge and skill not available to the ordinary witness." Id.

Ms. Sposato is qualified to competently testify concerning the above categories she identified. Ms. Sposato is an Advanced Registered Nurse Practitioner with 35 years of clinical nursing experience. See Sposato Resume, Exhibit 9 to Government's

Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261, 3/4/08). During her nursing career, the majority of Ms. Sposato's patients were Medicare patients. Ms. Sposato is familiar with Medicare billing codes and conducted internal audits to ensure compliance with Medicare regulations. Some of the Medicare claims submitted by the defendants' company listed osteoarthritis as the diagnosis. Ms. Sposato has experience treating osteoarthritis patients.

### 2.     Reliability

The second requirement is reliability. Reliability is different than believability or persuasiveness, which remains an issue for the trier of fact. Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 n. 7 (11th Cir. 2005). To evaluate the reliability of scientific expert opinion, courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique and (4) whether the technique is generally accepted in the scientific community. These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. Frazier, 387 F.3d at 1261-62.

The government argues that "[f]or [the] type of analysis [conducted by Ms. Sposato], no peer-reviewed studies or rates of error will be available, but those limitations do not suggest that Sposato's method was unreliable, only that she was not conducting a scientific study. Her method is suited to the task at hand and there is no reason to question its reliability." See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 11, 3/4/08). The Court agrees

with the government that the factors that would normally be used to gauge scientific expert opinion, such as peer review, publication and rates of error, are not appropriate in assessing Ms. Sposato's testimony under Rule 702.

With respect to Category 1, Ms. Sposato explained that she found a large number of packets where the diagnosis was osteoarthritis and the prescription was for a prosthetic limb or brace. Ms. Sposato determined that these packets fell into category 1 (the diagnosis written on the medical order doesn't support the treatment prescribed) because it was clear that an artificial limb is not used to treat osteoarthritis and that a brace was also improper because the affected area should not be immobilized. Ms. Sposato made these determinations based on her nurse training and experience with osteoarthritis patients.

At the evidentiary hearing, the defendants challenged Ms. Sposato position that braces should not be used to treat osteoarthritis. On cross-examination, Ms. Sposato agreed that some doctors do prescribe soft braces to support patients with osteoarthritis, although this practice is disfavored. Ms. Sposato could not testify as to the number of soft braces that were prescribed in the packets she identified under category 1. The defendants argue that Ms. Sposato's testimony as to category 1 is unreliable because she included soft braces which could be used to treat osteoarthritis. Following the Daubert hearing, Ms. Sposato reviewed sample packets for five of the fourteen supplier companies and attested that only 3.58% of the submitted claims were for soft braces or braces where the fabrication could not be determined. See Affidavit of Sposato, Government's Supplement to Response to Motion to Exclude Expert Testimony (DE# 283 at Exhibit 1, 3/26/08).

The inclusion of soft braces in category 1 does not render Ms. Sposato's testimony unreliable. The majority of the packets in category 1 concern artificial limbs or hard braces. Ms. Sposato can still testify that the use of soft braces to treat osteoarthritis is not recommended. The defendants are free to cross-examine Ms. Sposato at trial about the use of soft braces in treating osteoarthritis. See Daubert, 509 U.S. at 596 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Category 5 concerns packets where the treatment prescribed on the order was inconsistent with the HCPCS codes in the packet. In identifying packets that fell within category 5, Ms. Sposato compared the HCPCS codes written on the prescription with the HCPCS code manual. Ms. Sposato has experience reviewing medical prescriptions and has previously worked with Medicare billing codes in her nursing career and during the audits she conducted. Ms. Sposato's methodology of comparing the HCPCS codes in the packets with the Medicare coding books is easily verifiable and reliable. See United States v. Cano, 289 F. 3d 1354 (11th Cir. 2002) (affirming admission of agent's non-expert testimony concerning the meaning of hieroglyphics in drug ledgers).

Category 7 (the order prescribes a medically excessive amount of durable medical equipment) is comprised only of excessive reusable ostomy supplies. In Ms. Sposato's experience, a patient only needs two reusable ostomy pouches. The packets she examined prescribed 30 reusable ostomy pouches. At the Daubert hearing, the defendants challenged the reliability of Ms. Sposato's testimony concerning category 7. The defendants argue that Ms. Sposato's testimony is unreliable because she could

have misinterpreted the information on the packets such that the number "30" could represent the number of times a patient had to change the ostomy pouch and not the number of pouches ordered. Following the hearing, Ms. Sposato and an FBI agent compared sixteen packets where ostomy pouches had been prescribed with the claims submitted to Medicare by the defendants' billing company. In each instance, the defendants billed Medicare for 30 reusable ostomy pouches per patient, per month. See Government's Supplement to Response to Motion to Exclude Expert Testimony (DE# 283, 3/26/08). Thus, Ms. Sposato correctly interpreted the information in the packets concerning the number of ostomy pouches ordered. The Court finds that this testimony is reliable. Ms. Sposato has experience treating patients with ostomies and can certainly testify at trial that 30 pouches per patient per month is excessive.

Category 8 (the order implies a suspiciously extreme injury, either through what is prescribed, or what HCPCS codes are written) concerns packets where the suggested injury was extensive. In one example, Exhibit H8, the patient was missing half her pelvis, her left hip and leg and her left arm and shoulder. Ms. Sposato admitted that there may be some Medicare patients who have this type of extreme injury, such as a trauma case or where the patient has extensive bone cancer. However, the packets she examined revealed hundreds of such patients with such extreme injuries. Ms. Sposato may testify that the order implies an "extreme injury," either through what is prescribed, or what HCPCS codes are written. The Court will not permit Ms. Sposato to testify that the injuries were "suspicious."

    3.    **Helpfulness**

The third requirement for admissibility is that the expert testimony must assist the

trier of fact. "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person . . . . Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. Medicare billing codes, the treatment of osteoarthritis patients and the use of ostomy supplies is beyond the knowledge of an ordinary juror. Ms. Sposato's testimony will assist the jury in understanding the facts of this case.

**II.    Dr. Klaus J. Miescke and Stephen Sulpor**

The defendants seek to exclude the testimony of Dr. Klaus J. Miescke and Stephen Sulpor.[9] "Dr. Miescke and Mr. Sulpor are statisticians who selected a sample of the billing papers seized from [the defendants' billing company] in August 2004." See Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert Hearing (DE# 247 at Exhibit A at 1, 2/21/08). Under the facts of the instant case, the Court finds that Dr. Mieske and Mr. Sulpor's testimony should be excluded. The government will provide testimony as to the defendants' alleged fraudulent billing practices. The government may argue in closing arguments that the number of packets examined by Ms. Sposato was sufficient to infer that similar information would be contained in the unexamined packets. The testimony of a statistician may confuse the jury and would not necessarily assist the jury in understanding the facts of the case. As such, Dr. Mieske and Mr. Sulpor should not be permitted to testify at trial under the facts of the instant case.

---

[9] The government intends to call only Dr. Miescke at trial. See Government's Response to Motions to Compel Discovery and to Exclude Expert Testimony (DE# 261 at 4 n. 5, 3/4/08).

13

**CONCLUSION**

Ms. Sposato's education and experience qualify her to offer her opinions concerning the aforementioned four categories. The methods employed by Ms. Sposato in evaluating the packets are reliable and her testimony will assist the jury in understanding the evidence. With respect to the government's statisticians, the Court finds that their testimony may confuse the jury and would not necessarily assist the jury in understanding the facts of the case. Accordingly, Mabel and Abner Diaz's Motion in Limine to Exclude Expert Testimony, or Alternatively, Request for Daubert Hearing (DE# 247, 2/21/08) is **GRANTED in part and DENIED in part**.

DONE AND ORDERED in Chambers at Miami, Florida, this **28th** day of March, 2008.

JOHN J. O'SULLIVAN
U. S. MAGISTRATE JUDGE

c:   Honorable Judge Ungaro
     All Counsel of Record